

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-13-2001

# Hutchins v. Wilentz Goldman

Precedential or Non-Precedential:

Docket 98-6248

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Hutchins v. Wilentz Goldman" (2001). *2001 Decisions.* Paper 129.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/129

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 13, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-6248 & 98-6339

CHARLES T. HUTCHINS

v.

WILENTZ, GOLDMAN & SPITZER;
LOUIS DeLUCIA;
JOHN DOES "1" THROUGH JOHN DOES "3";
JOAN LAVERY

(Newark D.C. Civil No. 96-4678)

CHARLES T. HUTCHINS

v.

ABC CORP., SEALED

(Newark D.C. Civil No. 96-5988)

   Charles T. Hutchins,
   Appellant

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action Nos. 96-cv-04678 & 96-cv-05988
(Honorable Katharine S. Hayden)

Argued February 8, 2001

Before: SCIRICA, McKEE and STAPLETON, Circuit Judges

(Filed: June 13, 2001)

CHARLES T. HUTCHINS (ARGUED)
5011 Marshall Road
Farmingdale, New Jersey 07727

 Appellant, Pro Se

MARIANNE E. MURPHY, ESQUIRE
 (ARGUED)
Tompkins, McGuire, Wachenfeld &
 Barry
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

 Attorney for Appellees,
Wilentz, Goldman & Spitzer,
Louis DeLucia, Joan Lavery

DOUGLAS HALLWARD-DRIEMEIER,
 ESQUIRE (ARGUED)
DOUGLAS N. LETTER, ESQUIRE
MICHAEL E. ROBINSON, ESQUIRE
United States Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W., Room 9106
Washington, D.C. 20530

 Attorneys for Amicus Curiae-
Appellant, United States of
America

OPINION OF THE COURT

SCIRICA, Circuit Judge.

The principal issue on appeal is whether the submission of fraudulent legal bills for approval to the United States Bankruptcy Court violates the False Claims Act, 31 U.S.C. S 3729. We hold the False Claims Act only prohibits fraudulent claims that cause economic loss to the government. We also hold that a r etaliatory discharge cause of action under 31 U.S.C. S 3730(h) requires proof that the employee engaged in "protected conduct" and that the

2

employer was on notice of the "distinct possibility" of False Claims Act litigation and retaliated against the employee.

I.

Charles Hutchins was one of two paralegals in the creditors' rights department of the New Jersey law firm of Wilentz, Goldman & Spitzer from Mar ch 1993 to October 1995. On August 2, 1995, Louis T. DeLucia, a partner in Wilentz, Goldman & Spitzer's creditors' rights department, asked Hutchins to investigate certain client bills, with particular attention to the "high costs" of certain computerized research. After investigating the matter and discussing it with the law firm's paralegal supervisor, Marie Henneberry, Hutchins submitted a short memorandum to DeLucia stating, "I was told that the fir m has a policy whereby actual Westlaw and LEXIS expenses are multiplied by 1.5 in order to arrive at the amount the client is invoiced for." Hutchins also expressed concer n to Henneberry that paralegals were being used to perfor m secretarial tasks resulting in overcharging clients.

On September 22, 1995, over a month after submitting his billing practices memorandum, Hutchins was summoned by firm management to a meeting to discuss his continued employment. Hutchins contends the lawfirm wanted to fire him because of his "investigation" into their fraudulent billing practices. Wilentz, Goldman & Spitzer countered they were upset over Hutchins's relationships with other firm employees, and wanted to discuss an anonymous memorandum circulated in May 1995 containing disparaging comments about Andrew W agner, the other paralegal in the creditors' rights department. The law firm advised Hutchins that they believed he wrote the memorandum. After denying involvement, Hutchins wr ote a letter to Kim Haan, a paralegal in another department whom he believed was the source of the accusation, stating,

> You considered my prior uses of guerilla tactics against the I.R.S., my ex-wife and her attorneys as evidence that I wrote the . . . [disparaging memorandum]. The I.R.S. has stolen my money, locked me up in court battles for a decade, ruined a relationship/marriage

3

engagement, harassed me and filed hundreds of thousands of dollars in tax liens against me. My ex-wife and her attorneys used perjured testimony and affidavits to induce the government courts to issue restraining orders keeping me away fr om my children. There just is no comparison between these interferences with my money and my kids, and someone propositioning a married woman in the office . . . . After you've read Atlas Shrugged two or three more times (I've read it five times) you may recognize Rand's belief that free men have a moral duty to resist abuses of government and to resist the ef forts of those who misuse government agencies and gover nment power for personal reasons. Her philosophy guides my subtle warfare against tyrants. Its [sic] a great deal more appropriate than blowing up federal buildings . . . .

I suppose I would hope that if you learn anything from all of this it would be not to be so quick to rush to judgment about people . . . and that you would be careful about what you say about people. The next time you might injure someone less prepar ed to deal with abuse, or the person you injure just mightfile a defamation/slander lawsuit against you.

Haan reported to the firm personnel manager, Anne Riegle, that she was "terrified" by the letter. Riegle noted that Haan was "visibly upset" believing that Hutchins might "do something to her." On Friday, September 27, 1997, the law firm decided to terminate Hutchins as a result of "the culmination of escalating problems with his superiors and with staff."

When informed of the decision to terminate Hutchins, Haan asked the law firm to wait until after the weekend to inform him. Because she was taking the law school admission test that weekend, Haan explained that she was afraid Hutchins would attempt to disrupt her . She also asked to be excused from work the following Monday and Tuesday so that she would not be present when Hutchins was discharged. Wilentz, Goldman & Spitzer agreed.

On Monday, October 2, 1995, Hutchins requestedfiles from the accounting department reflecting the law firm's

4

billing of Westlaw and LEXIS expenses. The accounting department denied him access. Two hours later , Hutchins was informed that he was fired.

On October 18, 1995, Hutchins notified the United States Trustee by sworn affidavit that he believed Wilentz, Goldman & Spitzer had engaged in fraudulent and unlawful billing practices. He filed a pro se qui tam complaint under S 3729 of the False Claims Act alleging W ilentz, Goldman & Spitzer submitted fraudulent billing statements to the United States Bankruptcy Court and that the lawfirm violated the whistleblower provisions of the False Claims Act, 31 U.S.C. S 3730(h), by terminating his employment because of his investigation into the firm's billing practices.

The District Court dismissed Hutchins's qui tam  claim under Fed. R. Civ. P. 12 (b)(6),1  and granted Wilentz, Goldman & Spitzer summary judgment on Hutchins's retaliatory discharge claim.2

II.

The District Court had jurisdiction over Hutchins's qui tam and retaliatory discharge claims under 28 U.S.C. S 1331. We have jurisdiction over the District Court's final order dismissing his claims under 28 U.S.C.S 1291. We exercise plenary review over the District Court's grant of summary judgment on Hutchins's retaliatory discharge claim and its dismissal of his qui tam claim under Fed. R. Civ. P. 12 (b)(6). Liberty Lincoln-Mer cury, Inc. v. Ford Motor Co., 171 F.3d 818, 822 (3d Cir. 1999); Malia v. Gen. Elec. Co., 23 F.3d 828, 830 (3d Cir.), cert. denied, 513 U.S. 956 (1994).

_____

1. United States ex rel. Hutchins v. W ilentz, Goldman & Spitzer, C.A. No. 96-5988, slip. op. at *4 (D.N.J. August 4, 1998) ("Hutchins I") (dismissing
qui tam claim).

2. United States ex rel. Hutchins v. W ilentz, Goldman & Spitzer, C.A. No. 96-5988, slip. op. at *15-16 (D.N.J. September 8, 1998) ("Hutchins II") (granting defendant summary judgment on retaliatory discharge claim).

III.

A.

The False Claims Act provides:

> (a) Liability for certain acts – Any person who –
>
> (1) knowingly presents, or causes to be pr esented, to an officer or employee of the United States Government or a member of the Armed For ces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim or fraudulent claim paid or approved by the Government;
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
>
> * * *
>
> (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. S 3729. An action under the False Claims Act may be commenced in two ways. The United States Department of Justice may file suit to collect damages suffered as the result of fraudulent claims which cause government money to be expended from the United States Treasury. Alternatively, a private plaintiff may bring a qui tam action3 on behalf of the government to recover losses

_____

3. In Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 768 n.1 (2000) (inter nal citations omitted), the United States Supreme Court set forth the historical foundations of the

6

incurred because of fraudulent claims. 31 U.S.C. S 3730(b)(1). When a private plaintiff brings a qui tam action, the government is permitted to intervene. But the private plaintiff may continue his suit even if the government declines to intervene. 31 U.S.C.S 3730(c)(1). If the qui tam suit is ultimately successful, the private plaintiff, known as a relator, is entitled to up to 30% of the funds the government recovers. 31 U.S.C.S 3730(d).

B.

Relying on the qui tam provisions of the False Claims Act, Hutchins filed suit alleging that Wilentz, Goldman & Spitzer's submission of inflated legal bills to the United States Bankruptcy Court violated S 3729(a)(1) of the False Claims Act.4 To establish a prima facie case under the False

_____

qui tam suit stating, "qui tam is short for the Latin phrase qui tam pro domino rege quam pro se ipso in hac parte sequitur, which means `who pursues this action on Lord the King's behalf as well as his own.' The phrase dates from at least the time of Blackstone." The Court further explained,

> Qui tam actions appear to have originated ar ound the end of the 13th century, when private individuals who had suf fered injury began bringing actions in the royal courts on both their own and the
> Crown's behalf. Suit in this dual capacity was a device for getting their private claims into the respected r oyal courts, which generally
> entertained only matters involving the Crown's interest.

Id. at 774 (internal citations omitted).

The Court noted that in the 14th century,

> Parliament began enacting statutes that explicitly provided for qui tam suits. These were of two types: those that allowed injured parties to sue in vindication of their own inter ests (as well as the
> Crown's) . . . and . . . those that allowed informers to obtain a portion of the penalty as a bounty for their infor mation (about those
> who transgressed against the king) even if they had not suffered the
> injury themselves.

Id. at 775 (internal citations omitted).

4. As noted, S 3729(a)(1) provides:

Claims Act a plaintiff must prove: (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; (3) the defendant knew the claim was false or fraudulent; and (4) the United States suffer ed damages as a result of the false or fraudulent claim. Young–Montenay, Inc. v. United States, 15 F.3d 1040, 1043 (Fed. Cir. 1994) (quoting Miller v. United States, 550 F .2d 17, 23 (Ct. Cl. 1977)). It is undisputed that the United States T rustee and the United States Bankruptcy Courts are gover nment agents for purposes of the False Claims Act. Additionally, it is clear that inflating the Westlaw and LEXIS expenses was unlawful under the Bankruptcy Code.

The crux of the dispute is whether the submission of these fraudulent bills was a "false claim for payment or approval" that caused damage to the United States government. Focusing on the latter portion of S 3729(a)(1), Hutchins contends that even if no government money were expended from the United States Tr easury in connection with the law firm's inflated legal bills, the submission of these bills for approval by the Bankruptcy Court violates the False Claims Act.

Although not linguistically implausible, we find no support for this reading from the jurisprudence interpreting the False Claims Act. Rainwater v. United States , 356 U.S. 590, 592 (1958) ("It seems quite clear that the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims."); United States ex rel. Marcus v. Hess, 317 U.S. 537, reh'g denied, 318 U.S. 799 (1943). Nor have we been able to find any case establishing that a false statement to the gover nment which does not cause the government economic loss gives rise to False Claims Act liability. United States ex r el. Hopper v.

_____

    Any person who–

    (1) knowingly presents, or caused to be pr esented, to an officer or
    employee of the United States Government, or a member of the
    Armed Forces of the United States a false or fraudulent claim for
    payment or approval . . . is liable . . . .

8

Anton, 91 F.3d 1261, 1266 (9th Cir . 1996) ("[T]he Act attaches liability, not to underlying fraudulent activity, but to the `claim for payment.' ") (quoting United States v. Rivera, 55 F.3d 703, 709 (1st Cir . 1995)), cert. denied, 519 U.S. 1115 (1997).

"Not all false statements made to the federal government are claims within the meaning of the False Claims Act." United States v. Greenberg, 237 F . Supp. 439, 442 (S.D.N.Y. 1965) (citing United States v. Howell, 318 F .2d 162 (9th Cir. 1963)). "Even under a somewhat broader definition, only `actions which have the purpose and effect of causing the government to pay out money are clearly`claims' within the purpose of the Act.' " United States v. Lawson, 522 F. Supp. 746, 750 (D.N.J. 1981) (quoting United States v. Silver, 384 F. Supp. 617, 620 (E.D.N.Y. 1974), aff 'd, 515 F.2d 505 (2d Cir. 1975)); see also United States v. Neifert–White Co., 390 U.S. 228, 233 (1968) (False Claims Act reaches to "all fraudulent attempts to cause the Government to pay out sums of money."). As the Supreme Court r ecognized in United States v. McNinch, 356 U.S. 595, 599 (1958) (quoting United States v. Tieger, 234 F.2d 589, 591 (3d Cir. 1956)), " `The conception of a claim against the government normally connotes a demand for money or for some transfer of public property.' " In McNinch, the Supreme Court traced the legislative history of the False Claims Act stating,

> The False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the W ar Department. Testimony before Congr ess painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally r obbed in purchasing the necessities of war. Congr ess wanted to stop this plundering of the public treasury. At the same time it is equally clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government.

Id. at 599; see also United States ex r el. Pogue v. Am. Healthcorp., Inc., 914 F.Supp. 1507, 1512 (M.D.Tenn. 1996) ("The legislative history of the False Claims Act reveals that

9

it was designed to protect the Federal T reasury.") (citing S. Rep. No. 99-345 at 4 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5269).

In this regard, we believe Hutchins's r eading of the statute expands the False Claims Act's scope of liability to include actions not contemplated by Congress. His argument neglects the statutory definition of the term "claim" which provides,

> For purposes of this section, "claim" includes any request or demand whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor , grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. S 3729(c).

The False Claims Act seeks to redress fraudulent activity which causes economic loss to the United States government. As the Supreme Court held in Hess, the purpose of the False Claims Act "was to pr ovide for restitution to the government of money taken from it by fraud." 317 U.S. at 551. It was not intended to impose liability for every false statement made to the government.5 Costner v. URS Consultants, Inc., 153 F .3d 667, 677 (8th Cir. 1998) ("[O]nly those actions by the claimant which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due, are properly consider ed `claims' within the meaning of the FCA.").

_____

5. Extending the False Claims Act to reach any false statement made to the government, regardless of any impact on the United States Treasury, would appear to impermissibly expand standing doctrine and essentially permit any plaintiff to sue on behalf of the government when false or misleading statements are made to any gover nment agent including the courts, the legislature or any law enfor cement officer.

10

For these reasons, we hold the submission of false claims to the United States government for approval which do not cause financial loss to the government are not within the purview of the False Claims Act. Tieger, 234 F.2d at 592 ("The provision relating to the payment or approval of a `claim upon or against' the Government relates solely to the payment or approval of a claim for money or property to which a right is asserted against the Government."). Unless these claims result in economic loss to the United States government, liability under the False Claims Act does not attach. United States v. Bornstein, 423 U.S. 303, 309 n.4 (1976) (" `The conception of a claim against the government normally connotes a demand for money or for some transfer of public property.' ") (quoting McNinch, 356 U.S. at 599).

C.

In dismissing plaintiff 's claims, the District Court stated the Bankruptcy Court was merely acting as an intermediary in approving defendant's false claims. The court noted, "[In most False Claims Act actions] the intermediary [to whom the defendants submitted false claims] has control over government funds for the purpose of properly reimbursing a non-fraudulent party, and the suit is filed because the funds wind up in the hands of an improper claimant." Hutchins I, slip. op. at *4. The District Court noted that the Bankruptcy Court, as intermediary, did not have similar control over the funds. Permitting this claim, said the District Court, would mean the False Claims Act would "apply whenever an individual submits a government–approved false claim to a third party who happens to owe an unrelated debt to a government agency." Id. at *4–5.

In its amicus curiae brief, the government contends the District Court improperly implied that a False Claims Act plaintiff who alleges the defendant caused an intermediary to submit a false claim on its behalf must establish that the intermediary had control over the government funds. To the extent the District Court's opinion implies an "intermediary control" requirement, we agree with the government that the District Court erred. The proper inquiry under the False Claims Act is not whether an intermediary controls

11

government funds for any period of time but whether the defendant causes, or will cause, the intermediary to make a false claim against the government r esulting in a financial loss to the treasury. See, e.g., Neifert-White Co., 390 U.S. at 233; Rainwater, 356 U.S. at 591. Several cases recognize that a plaintiff may assert a cause of action under the False Claims Act even when an intermediary, such as a subcontractor, is merely a conduit to the transfer of government funds. See, e.g., Bor nstein, 423 U.S. at 309; United States v. Ueber, 299 F.2d 310, 313 (6th Cir. 1962). The intermediary need not have discretion over, or even possession of, the government funds to establish that the defendant violated the False Claims Act. Ther efore, we reiterate that the proper inquiry under the False Claims Act is whether the defendant made fraudulent claims that caused economic loss to the United States Tr easury.

D.

On appeal, Hutchins contends Wilentz, Goldman & Spitzer's submission of fraudulent legal bills to the Bankruptcy Court constitutes a reverse false claim in violation of S 3729(a)(7). He argues that if the government were a creditor to a bankrupt estate, it would suffer "economic loss" by reason of the estate paying inflated legal bills.

The False Claims Act recognizes that a party may be liable for a reverse false claim if he "knowingly makes, uses, or causes to be made or used, a false recor d or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Gover nment." 31 U.S.C. S 3729(a)(7). But in his complaint, Hutchins never asserted a reverse false claim cause of action under 31 U.S.C. S 3729(a)(7), nor did he allege the gover nment was a creditor in any of the bankrupt estates in which Wilentz, Goldman & Spitzer submitted inflated legal bills.

As noted, the District Court dismissed Hutchins's claim on a Fed. R. Civ. P. 12(b)(6) motion. Our r eview therefore is limited to reviewing the claims alleged in his complaint.6

---

6. See, e.g., Mahone v. Addicks Utility Dist. of Harris County, 836 F.2d 921, 935 (5th Cir. 1988) ("It is black-letter law that `[a] motion to dismiss

12

Because Hutchins did not plead this cause of action, nor file a motion to amend his complaint to raise this cause of action, we will not address his reverse false claim argument on appeal.

IV.

Hutchins also alleges that Wilentz, Goldman & Spitzer fired him in retaliation for his investigation and reporting of fraud in violation of 31 U.S.C. S 3730(h). Section 3730(h) provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiating of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

This so called "whistleblower" provision protects employees who assist the government in the investigation and prosecution of violations of the False Claims Act. Neal v. Honeywell Inc., 33 F.3d 860, 861 (7th Cir. 1994). Congress enacted S 3730(h) "to encourage any individuals knowing of Government fraud to bring that information forward." S. Rep. No. 99-345, at 4 (1986), reprinted in 1986 U.S.C.C.A.N. 5266. "[F]ew individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment or any other for m of retaliation." Id. at 5300. Ther efore, S 3730(h) broadly protects employees who assist the gover nment in prosecuting and investigating False Claims Act violations.

A plaintiff asserting a cause of action underS 3730(h) must show (1) he engaged in "protected conduct," (i.e., acts

_____

for failure to state claim under Federal Rule Civil Procedure 12(b)(6) is to
be evaluated only on the pleadings.' ") (quoting Jackson v. Procunier, 789 F.2d 307, 309 (5th Cir. 1986)); see also 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Pr ocedure S 1356 (2d ed. 1990).

13

done in furtherance of an action under S 3730) and (2) that he was discriminated against because of his "pr otected conduct." United States ex rel. Y esudian v. Howard Univ., 153 F.3d 731, 736 (D.C. Cir. 1998) (quoting S. Rep. No. 99–345, at 35 (1986), reprinted in 1986 U.S.C.C.A.N. 5300). In proving that he was discriminated against "because of " conduct in furtherance of a False Claims Act suit, a plaintiff must show that (1) his employer had knowledge he was engaged in "protected conduct"; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in "protected conduct."7 Id.; see also Zahodnick v. Int'l Bus. Machines Corp., 135 F .3d 911, 914 (4th Cir. 1997). At that point, the bur den shifts to the employer to prove the employee would have been terminated even if he had not engaged in the protected conduct. Mikes v. Strauss, 889 F. Supp. 746, 754 (S.D.N.Y. 1995).

At issue here is whether Hutchins engaged in"protected conduct," and whether Wilentz, Goldman & Spitzer was on notice that he was pursuing (i.e., acting in furtherance of) a False Claims Act suit and retaliated against him. Hutchins claims he engaged in three activities that were "protected conduct" that put his employer on notice that he was investigating and pursuing a potential False Claims Act suit. First, he cites the memorandum he wrote to Louis DeLucia concerning the law firm's"practice" of overcharging clients for Westlaw and LEXIS research costs.

_____

7. The requirement that employers have knowledge that an employee is engaged in "protected conduct" ensur es that S 3730(h) suits are only prosecuted where there has been actual retaliation. Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 951 (5th Cir. 1994) (quoting S. Rep. No. 99–345, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5300), cert. denied, 513 U.S. 1154 (1995). As the Court of Appeals for the Seventh Circuit has noted, knowledge on the part of the employer is necessary because,

> Some employees will cry "fraud" to make pests of themselves, in the hope of being bought off with higher salaries or more desirable assignments. Others will perceive the disappointments of daily life as "retaliation" and file suits that have some settlement value because of the high costs of litigation and the possibility of error.

Neal, 33 F.3d at 863.

14

Second, he points to his inquiry to Marie Henneberry, the paralegal supervisor, about this billing practice as well as the practice of using paralegals to perfor m secretarial functions resulting in inflated client bills. Finally, he cites his request for billing documents from the accounting department.

In granting defendant's motion for summary judgment, the District Court found Hutchins failed to engage in "protected conduct" and that Wilentz, Goldman & Spitzer was not on notice of potential False Claims Act litigation when it fired him. The court found Hutchins's investigation and reporting of the Westlaw and LEXIS billing practice was not "protected conduct" because,

> plaintiff only looked into the firm's research costs because his supervisor, defendant DeLucia, asked him to. The memo and all research involved, was therefore, the product of a specific assignment given to him by his supervisor. It was not the result of plaintiff 's independent investigation prompted by a suspicion of fraud upon the government.

Hutchins II, slip. op. at *13. Additionally, the court stated,

> [T]he record is clear that at no point did plaintiff complain or express any objection to the fir m's alleged policy of inflating research costs. He merely performed the limited billing research his supervisor asked of him, wrote his findings down in an inter office memo, and submitted it to DeLucia.

Id. at *15. Finally the court stated,

> [Hutchins] fail[ed] to establish facts that demonstrate he alerted his employer, or acted so as to put it on notice, that he was investigating alleged wr ongdoings and might be reporting them. Plaintiff 's assertions that he knew about unlawful practices, standing alone, without facts to support a finding that defendantfired him in retaliation for investigating and possibly reporting what he discovered, do not constitute enough evidence to support his federal claim in this action.

Id. at *16.

15

A.

An employee must engage in "protected conduct" in order to assert a claim under S 3730(h). In addr essing what activities constitute "protected conduct," the "case law indicates that `protected [conduct]' r equires a nexus with the `in furtherance of ' prong of [a False Claims Act] action." McKenzie v. Bellsouth Telecomm., Inc., 219 F.3d 508, 515 (6th Cir. 2000). This inquiry involves deter mining "whether [plaintiff 's] actions sufficiently furthered `an action filed or to be filed under' the [False Claims Act] and, thus, equate to `protected [conduct].' " Id. at 516. Section 3730(h) specifies that "protected conduct" includes "investigation for, initiating of, testimony for, or assistance in" a False Claims Act suit. 31 U.S.C. S 3730(h).

Determining what activities constitute "pr otected conduct" is a fact specific inquiry. But the case law indicates that "the protected conduct element . . . does not require the plaintiff to have developed a winning qui tam action . . . . It only requires that the plaintiff engage[ ] in `acts . . . in furtherance of an action under[the False Claims Act].' " Yesudian, 153 F.3d at 739 (quoting 31 U.S.C. S 3730(h)). Under the appropriate set of facts, these activities can include internal reporting and investigation of an employer's false or fraudulent claims. Id. at 742 ("[It] would [not] . . . be in the interest of law-abiding employers for the [False Claims Act] to force employees to report their concerns outside the corporation in or der to gain whistleblower protection. Such a requir ement would bypass internal controls and hotlines, damage corporate efforts at self-policing, and make it difficult for corporations and boards of directors to discover and corr ect on their own false claims made by rogue employees or managers."); see also Childree v. UAP/GA Chem, Inc., 92 F .3d 1140, 1146 (11th Cir. 1996), cert. denied, 519 U.S. 1148 (1997); Hopper, 91 F.3d at 1269 ("[P]laintiff must be investigating matters which are calculated, or reasonably could lead to a viable [False Claims Act] action."); Neal, 33 F.3d at 864. "Mere dissatisfaction with one's treatment on the job is not, of course, enough. Nor is an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations." Y esudian, 153 F.3d at 740

16

(citing Hopper, 91 F.3d at 1269); see also Zahodnick, 135 F.3d at 914 ("Simply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that Zahodnick was acting `in furtherance of ' a qui tam action."); United States ex r el. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1523 (10th Cir. 1996).

As noted, employees need not actually file a False Claims Act suit to assert a cause of action under S 3730. Requiring an employee to actually file a qui tam suit would blunt the incentive to investigate and report activity that may lead to viable False Claims Act suits. The False Claims Act was enacted to encourage parties to report fraudulent activity and was intended to "protect employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together ." Yesudian, 153 F.3d at 740 (citing Neal, 33 F .3d at 864).

B.

As noted, the False Claims Act also requir es employees to prove they were discriminated against"because of " their "protected conduct." To meet this r equirement, a plaintiff must show his employer had knowledge that he was engaged in "protected conduct" and that the employer retaliated against him because of that conduct. Several courts of appeals have held that the knowledge pr ong of S 3730 liability requires the employee to put his employer on notice of the "distinct possibility" of False Claims Act litigation. Yesudian, 153 F.3d at 740; Childree, 92 F.3d at 1146; Hopper, 91 F.3d at 1269; Neal, 33 F.3d at 864. We agree with this formulation.

An employer's notice of the "distinct possibility" of False Claims Act litigation is essential because without knowledge an employee is contemplating a False Claims Act suit, "there would be no basis to conclude that the employer harbored [S 3730(h)'s] prohibited motivation [i.e., retaliation]." Mann v. Olsten Certified Healthcare Corp., 49 F. Supp.2d 1307, 1314 (M.D. Ala. 1999). Courts have recognized "the kind of knowledge the [employer] must have mirrors the kind of activity in which the [employee] must be engaged. What [the employer] must know is that[the

17

employee] is engaged in protected activity .. . –– that is, in activity that reasonably could lead to a False Claims Act case."8 Yesudian , 153 F.3d at 742.

"Merely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement – just as it does not constitute protected conduct in the first place." Id. at 743. As one court has stated, the inquiry into whether an employee puts his employer on notice is

> [w]hether the employee engaged in conduct fr om which a fact finder could reasonably conclude that the employer could have feared that the employee was contemplating filing a qui-tam action against it or reporting the employer to the government for fraud . . . . [L]itigation . . . [is] a "distinct possibility" only if the evidence reasonably supports such fear; if the evidence does not support this fear, litigation would not have been a distinct possibility.

Mann, 49 F. Supp.2d at 1314; see also McKenzie, 219 F.3d at 514–15; Yesudian, 153 F.3d at 741–45; Neal, 33 F.3d at 863–865.

Whether an employer is on notice of the "distinct possibility" of False Claims Act litigation is also a fact specific inquiry. While "[a]n employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation," Luckey v. Baxter Healthcare Corp., 183 F.3d 730, 733 (7th Cir.), cert. denied, 528 U.S. 1038 (1999), the employer is on notice of the "distinct possibility" of litigation when an employee takes actions revealing the intent to report or assist the government in the investigation of a False Claims Act violation.

_____

8. We note that the "protected conduct" and notice requirements are separate elements of a prima facie case of r etaliation under S 3730. But as several circuits have recognized, the inquiry into these elements involves a similar analytical and factual investigation. See, e.g., Yesudian, 153 F.3d at 742.

18

C.

1.

In most retaliation cases under S 3730(h), the two critical questions are (1) what sort of activity constitutes "protected conduct," and (2) whether the employer was on notice that the employee was engaging in "protected conduct."9 Because the inquiry into these questions is intensely factual, we will examine reported cases that r eview whether an employee engaged in "protected conduct" and whether this conduct was sufficiently linked to the investigation of a False Claims Act suit that it put the employer on notice of the "distinct possibility" of litigation.

In Neal, 33 F.3d 860, an employee who worked at the Joliet Army Arsenal Plant concluded her co-workers were falsifying ammunition test data reports. She r eported this activity to her supervisor and to her employer's office of legal counsel. The employer's legal counsel then notified the United States Army which conducted an investigation and found plaintiff 's fraud allegations wer e true. The Court of Appeals for the Seventh Circuit found the plaintiff engaged in "protected conduct" and put her employer on notice of the "distinct possibility" of False Claims Act litigation when she reported the fraud to her employer's legal counsel. Specifically, the court noted that plaintif f "conducted her own investigation and reported her findings through corporate channels, leading to two additional investigations: one by [the defendant] and a second by the Ar my." Id. at 865.

In Yesudian, 153 F.3d 731, the Court of Appeals for the D.C. Circuit found an employee of Howar d University who

_____

9. As noted a prima facie case of retaliation under S 3730 requires proof that the plaintiff (1) engaged in "pr otected conduct," (i.e., acts done in
furtherance of an action under S 3730) and (2) that the plaintiff 's employer discriminated him because of his "pr otected conduct." In proving that he was discriminated against "because of " his activities in furtherance of a False Claims Act suit, a plaintif f must show that (1) his
employer had knowledge that he was engaged in "pr otected conduct"; and (2) that his employer's retaliation was motivated, at least in part, by
the plaintiff 's engaging in "pr otected conduct."

worked in the purchasing department engaged in"protected conduct" when he reported to upper-level University officials that his supervisor was engaged in fraudulent activity. The plaintiff reported, among other things, that his supervisor submitted false time and attendance r ecords, received bribes from vendors, and made payments to vendors who did not provide services to the University. The court held the plaintiff engaged in "pr otected conduct" and put the University on notice of the "distinct possibility" of a False Claims Act suit because he repeatedly advised his superiors that he had evidence of false recor ds. He wrote several letters to his supervisors and to the University President and Vice-President detailing what he believed was illegal conduct that fraudulently resulted in the loss of government money. He also collected evidence from employees to corroborate his claims and took photographs of evidence. The Court of Appeals for the D.C. Cir cuit held these reporting actions put the University administration, and plaintiff 's immediate supervisors, on notice of the "distinct possibility" of False Claims Act litigation. Id. at 744-45; see also Hopkins v. Actions, Incorp. of Brazoria County, 985 F.Supp. 706, 709-10 (S.D.T ex. 1997) (holding plaintiff who reported to chairman of company that employees were illegally using Medicare funds for payroll costs, as well as informed him that she intended to report this activity to the government, engaged in"protected conduct" that put employer on notice of the "distinct possibility" of litigation).

Not all complaints by employees to their supervisors put employers on notice of the "distinct possibility" of False Claims Act litigation. In Robertson, 32 F .3d 948, the Court of Appeals for the Fifth Circuit found an employee did not engage in "protected conduct" nor did he put his employer on notice of potential False Claims Act litigation when he reported to his supervisors that the company was billing the government for various helicopter pr ojects without properly substantiating the charges. The court noted the plaintiff "never used the terms `illegal,' `unlawful' or `qui tam action' in characterizing his concerns about[the] charges." Id. at 951; see also Mann, 49 F.Supp.2d at 1307.

In Zahodnick, 135 F.3d 911, the Court of Appeals for the Fourth Circuit found a managing engineer at IBM whose

20

job duties included assembling cost information for proposals to the Defense Intelligence Agency did not engage in "protected conduct" and failed to put his employer on notice of the "distinct possibility" of a False Claims Act suit. In Zahodnick, plaintiff engineer reported to his supervisor that employees were overcharging the government for the amount of time they worked on government projects. The court stated,

> The record discloses that Zahodnick merely informed a supervisor of the problem and sought confirmation that a correction was made; he never informed anyone that he was pursuing a qui tam action. Simply reporting his concern of mischarging to the government to his supervisor does not establish that Zahodnick was acting "in furtherance of" a qui tam action.

Id. at 914 (citing Robertson, 32 F.3d at 951).

Last year in McKenzie, 219 F.3d 508, the Court of Appeals for the Sixth Circuit held a dispatcher for BellSouth, whose regular job duties included processing complaints about telephone service and closing "trouble reports" once telephone repairs were made, did not engage in "protected conduct" nor put her employer on notice of potential False Claims Act litigation when she complained to her supervisors that BellSouth was falsifying reports. It was BellSouth's policy that if repairs were not made within twenty-four hours of being reported, the customer was entitled to a refund for the period of time that telephone service was disrupted. Plaintiff alleged that various employees falsified time reports when outages were reported and when repairs were completed so that BellSouth could avoid paying reimbursements to customers, including several government agencies. Plaintiff complained to her supervisors about this practice and on one occasion showed her supervisor a newspaper article about a consumer fraud investigation by the Florida state attorney general. She also refused to falsify repair records. The court found the plaintiff did not engage in "protected conduct" reasoning that "when McKenzie brought her complaints to the attention of the BellSouth auditor and her supervisors, legal action was not a reasonable or distinct possibility . . . because [her complaints were] not

21

sufficiently connected to exposing fraud or false claims against the federal government." Id. at 516-17. The court stated the newspaper article McKenzie showed her supervisor "did not relate to a qui tam action and only discussed a consumer fraud investigation by the Florida state attorney general." Id. at 518. Additionally, the article was widely circulated and disseminated throughout the office. The court also reasoned that "although the newspaper article distributed and posted by McKenzie shows awareness of consumer fraud, the `in furtherance of ' language requires more than merely reporting wrongdoing to supervisors." Id. at 516. The court stated that McKenzie's "numerous complaints on the matter were directed at the stress from and pressure to falsify records, not toward an investigation into fraud on the federal government." Id. at 517. Therefore, McKenzie did not put BellSouth on notice of the "distinct possibility" that she might pursue a False Claims Act suit or inform the government that BellSouth's fraudulent conduct was causing an economic loss to the government.

These cases are illustrative of the general rule that a successful cause of action under S 3730 requires an employee to prove that he engaged in "protected conduct," that is conduct in furtherance of a False Claims Act suit, and that his employer was on notice of the "distinct possibility" of False Claims Act litigation and retaliated against him because of his "protected conduct." As noted, this is a fact specific inquiry.

2.

Although reporting "fraudulent" and "illegal" activity to an employer may satisfy the "protected conduct" and notice requirements in many S 3730(h) cases, in some instances where an employee's job duties involve investigating and reporting fraud, the employee's burden of proving he engaged in "protected conduct" and put his employer on notice of the "distinct possibility" of False Claims Act litigation is heightened. As the Court of Appeals for the Fourth Circuit held in Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 868 (4th Cir. 1999), "If an employee is assigned the task of investigating fraud within

22

the company, courts have held that the employee must make it clear that the employee's actions go beyond the assigned task [in order to allege retaliatory discharge under S 3730(h)]." The court stated that when an employee is assigned the task of investigating fraud, "such persons must make clear their intentions of bringing or assisting in a [False Claims Act] action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." Id. This r equirement is consistent with the understanding that the employer must be put on notice that the employee is contemplating a potential False Claims Act suit before liability will attach under S 3730(h).

In Ramseyer, 90 F.3d at 1523, the Court of Appeals for the Tenth Circuit found a plaintif f who was the clinical director of a mental health facility, whose r esponsibilities included monitoring compliance with applicable Medicaid requirements, did not engage in "pr otected conduct" when she reported to her superiors that the facility was not complying with various Medicaid requirements. The court reasoned that these reports to her supervisors, without more, did not put defendants on notice of a potential qui tam suit because the reporting was part of plaintiff 's job duties. The court stated,

> Plaintiff never suggested to defendants that she intended to utilize [their] non compliance in furtherance of a [False Claims Act] action. Plaintiff gave no suggestion that she was going to report such noncompliance to government officials, nor did she provide any indication that she was contemplating her own qui tam action. Rather, the monitoring and reporting activities described in plaintif f 's complaint [i.e., reporting to her superiors] wer e exactly those activities plaintiff was required to undertake in fulfillment of her job duties, and plaintif f took no steps to put defendants on notice that she was acting"in furtherance of " a [False Claims Act ] action.

Id. at 1523 (internal citations omitted).

In Robertson, 32 F.3d at 952, the Court of Appeals for the Fifth Circuit held a senior contract administrator with the

23

Army Helicopter Improvement Program, who was responsible for ensuring that costs were properly charged to the government and requests for additional government funding were properly substantiated, did not engage in "protected conduct" when he reported to his superiors that certain requests for additional government funding were not properly substantiated. In Robertson, plaintiff investigated and tried to verify the requests for funding and over the course of several months reported his findings to his superiors. The court found this activity was not protected because plaintiff " `did nothing to rebut his supervisor's testimony regarding their lack of knowledge that he was conducting investigations outside the scope of his job responsibilities in furtherance of a qui tam action.' " Id. (quoting district court opinion). The court reasoned that plaintiff "never characterized his concerns as involving illegal, unlawful, or false-claims investigations . . . . [There is] no evidence that [plaintiff] expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job." Id.

Even though an employee's job duties include investigating or reporting fraud, the employee may still engage in "protected conduct" and put his employer on notice of the "distinct possibility" of False Claims Act litigation. In Eberhardt, 167 F.3d at 868, the Court of Appeals for the Fourth Circuit stated an employee can put his employer on notice

> by expressly stating an intention to bring a qui tam suit, . . . [or by engaging in] any action which a fact finder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility. Such actions would include, but are not limited to, characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved. These types of actions are sufficient because they let the employer know, regardless of whether the employee's job duties include investigating potential fraud, that litigation is a reasonable possibility.

In Eberhardt, 167 F.3d at 868, a senior staff vice-president whose job duties included organizing his

24

employer's accounting system engaged in "pr otected conduct" and put his employer on notice of the"distinct possibility" of False Claims Act litigation when he began investigating his employer's charges to the United States State Department for work not actually perfor med. Although plaintiff 's job duties required him to investigate fraud, the court found he engaged in "protected conduct." The court reasoned plaintiff reported to his employer that the charges were "illegal." Id.  Additionally, he informed his employer that it was advisable to obtain legal counsel. The court concluded these activities were sufficient to put his employer on notice of potential False Claims Act litigation. Id.; see also Mann, 49 F. Supp.2d at 1316 (employee whose job duties included reporting and investigating compliance with Medicare regulations did not put employer on notice of False Claims Act litigation when she reported billing overcharges to supervisor because this r eporting was part of her regular job duties, however when she r eported this information to her employer's legal department she engaged in protected conduct).

D.

We fail to see how Hutchins engaged in "pr otected conduct." Similarly, we do not believe that W ilentz, Goldman & Spitzer was on notice of the "distinct possibility" of False Claims Act litigation and r etaliated against Hutchins because of his "protected conduct." Hutchins never threatened to report his discovery of the firm's Westlaw and LEXIS billing practices to a government authority, nor did he file a False Claims Act suit until after he was terminated. Childree, 92 F.3d at 1146. Furthermore, Hutchins never informed his supervisors he believed this billing practice was "illegal," Ramseyer , 90 F.3d at 1523, or that the practice was fraudulently causing gover nment funds to be lost or spent. Robertson, 32 F .3d at 951. Nor did he advise his employer that corporate counsel be involved in the matter. Eberhardt, 167 F.3d at 869. Rather, in a single memorandum he stated, "I was told thefirm has a policy whereby actual Westlaw and LEXIS expenses are multiplied by 1.5 in order to arrive at the amount the client is invoiced for." As held in Zahodnick , 135 F.3d at 914,

25

"simply reporting [a] concern of mischarging . . . does not establish that [plaintiff] was acting in furtherance of a qui tam action." Hutchins's memorandum mer ely stated, as a matter of fact, the firm's policy of passing on Westlaw charges to clients. The memorandum did not inform Wilentz, Goldman & Spitzer that he intended to use this information in furtherance of a qui tam action or that he was going to report it to government authorities because he believed the law firm was defrauding the government. Robertson, 32 F.3d at 952; Mikes, 889 F. Supp. at 753 (plaintiff must show employer was on notice that she was "laying the groundwork for legal action").

Nor did Hutchins's complaint to Marie Henneberry about the practice of paralegals performing secretarial tasks put the law firm on notice of the "distinct possibility" of False Claims Act litigation. Hutchins approached Henneberry only to "confirm basically that [another paralegal] had talked to her about [using paralegals for secr etarial tasks]," never advising Henneberry that he thought the practice was illegal or fraudulently causing loss of gover nment funds.10 Similar to the plaintiff in Zahodnick, Hutchins "merely informed a supervisor of a problem and sought confirmation that a correction was made." 135 F.3d at 914. As held in Luckey, "An employer is entitled to treat a suggestion for improvement as what it purports to be rather than a precursor to litigation." 183 F .3d at 733. Because Hutchins's single discussion with Henneberry did not allege fraud, illegality or a potential False Claims Act suit, we fail to see how the conversation put Wilentz, Goldman & Spitzer on notice of the "distinct possibility" of False Claims Act litigation. McKenzie, 219 F.3d at 516 (plaintiff "must sufficiently allege activity with a nexus to a qui tam action, or fraud against the United States Government").

Hutchins claims that aside from his "r eporting" (the memorandum to DeLucia and his conversation with Henneberry), he was involved in the initial investigation of a potential False Claims Act suit. See Y esudian, 153 F.3d at 740 (Section 3730(h) "protect[s] employees while they are

_____

10. Hutchins told Henneberry that he thought the practice was "unethical."

26

collecting information about a possible fraud, before they have put all the pieces of the puzzle together ."). He contends his discussion with Marie Henneberry about the Westlaw and LEXIS charges and his r equest for billing documents from the accounting department constituted "investigation" that put Wilentz, Goldman & Spitzer on notice of the "distinct possibility" of False Claims Act litigation. We disagree.

Hutchins's "investigation" was in response to a specific assignment from Louis DeLucia who asked him to determine why certain clients' computerized r esearch costs were so high. Hutchins's inquiry to Henneberry about the practice was not the result of his independent suspicions that the firm was involved in fraud. As held in Eberhardt, 167 F.3d at 868, if an employee is assigned the task of investigating fraud within the company, that employee must make it clear that his investigatory and r eporting activities extend beyond the assigned task in or der to allege retaliatory discharge under S 3730(h). We see no evidence that Hutchins engaged in any conduct, beyond what was specifically asked of him in accordance with his job duties, that gave any indication that he was investigating fraud for a potential False Claims Act suit. He did not communicate that he was going to report the activity to government officials nor that he was contemplating his own qui tam suit. Robertson, 32 F.3d at 952. He did not use the terms "illegal" or "fraud" nor did he attempt to discuss the billing practice with corporate counsel. Eberhar dt, 167 F.3d at 869; Neal, 33 F.3d at 865. Rather , he merely performed the task he was asked to complete by his supervisor . Ramseyer, 90 F.3d at 1523; Mann, 49 F. Supp.2d at 1316.

Hutchins contends his "investigation" into W estlaw and LEXIS billing was not part of his job duties. He ar gues that unlike the plaintiffs in Robertson, Ramseyer and Eberhardt, his job description as a paralegal did not contain "monitoring or reporting" activities, nor was he a "fraud investigator." Nonetheless, his inquiry into the Westlaw and LEXIS billing was in furtherance of his job duties. Because he performed the investigation at the direct request of his supervisor, there was no reason to believe that Hutchins would use the information he obtained to bring a qui tam

27

suit. Eberhardt, 167 F.3d 868 ("[An] employee must make it clear that [his] actions go beyond the assigned task."); Robertson, 32 F.3d at 952 (employee not engaged in "protected conduct" because his "actions were consistent with the performance of his [job] duty").

As S 3730(h) makes clear, without notice of an employee's intent to file or assist in a False Claims Act suit, an employer does not engage in prohibited retaliatory conduct under S 3730(h) when it terminates or demotes that employee. McKenzie, 219 F.3d at 516. Here, Wilentz, Goldman & Spitzer was not on notice that Hutchins was contemplating a qui tam suit. Regardless of his job description, Hutchins's "investigation" into the firm's billing practice resulted from a direction from his employer.

Finally, we do not believe Hutchins's request for billing documents from the accounting department was protected investigatory conduct that put the law firm on notice of the "distinct possibility" of False Claims Act litigation and therefore evidence that the law firm retaliated against him. As the record makes clear, Wilentz, Goldman & Spitzer decided to fire Hutchins before he requested these documents. Because the law firm was unaware of Hutchins's request for these documents when it decided to fire him, it did not retaliate against him in violation of S 3730(h) because of his "investigation" into the firm's accounting files.

Hutchins has failed to assert a prima facie case of retaliatory discharge under S 3730(h). By failing to prove that he engaged in "protected conduct" and that he put his employer on notice of the "distinct possibility" of False Claims Act litigation, Hutchins, as a matter of law, cannot prove a violation of S 3730(h). We agree with the District Court that Wilentz, Goldman & Spitzer did not terminate Hutchins in retaliation for his "investigation" in furtherance of a False Claims Act suit.

V.

For the foregoing reasons, we will affirm the District Court's dismissal of Hutchins's qui tam claims. We also will

28

affirm its grant of summary judgment for W ilentz, Goldman & Spitzer on the retaliatory discharge claims.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit