**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-4020
_____

UNITED STATES OF AMERICA *ex rel.* ANDRE PETRAS,

Appellant

v.

SIMPAREL, INC., DAVID ROTH, RON GRILLI,
LOG LOGISTICS, MONTERP ENTERPRISES,
a Canadian Corporation f/k/a RON CACCHIONE LLC
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-13-cv-02415)
District Judge: Hon. Freda L. Wolfson

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 20, 2016

Before: McKEE, *Chief Judge*,[1] HARDIMAN and RENDELL,
*Circuit Judges*.

(Opinion Filed: May 18, 2017)
_____

ROSS BEGELMAN
MARC M. ORLOW
Begelman, Orlow & Melletz
411 Route 70 East
Suite 245
Cherry Hill, N.J. 08034
        *Counsel for Appellant*

_____

[1] Judge McKee concluded his term as Chief of the U.S. Court
of Appeals for the Third Circuit on September 30, 2016.

DIANE KREBS
Gordon Rees Scully Mansukhani, LLP
One Battery Park Plaza, 28th Floor
New York, New York 10004
        *Counsel for Appellee Simparel, Inc.*

PAUL H. SHUR
MARK SKOLNICK
Platzer, Swergold, Levine, Goldberg, Katz & Jaslow, LLP
475 Park Avenue South, 18th Floor
New York, New York 10016

        *Counsel for Appellees David Roth and Ron Grilli*

_____

OPINION OF THE COURT
_____


McKEE, *Chief Judge*.

Andre Petras appeals the District Court's dismissal of his reverse False Claims Act suit against his former employer, Simparel, Inc.; David Roth, Simparel's founder and Chief Technology Officer; and Ron Grilli, Simparel's Chief Executive Officer (collectively, "the Simparel defendants").[2]

Petras initially alleged a reverse FCA claim[3] and retaliation claim[4] under the False Claims Act against the Simparel defendants, as well as a conspiracy claim[5] against all of the defendants. The District Court dismissed the reverse FCA claim without prejudice, but the remaining conspiracy and retaliation claims were dismissed with prejudice. Petras reasserted the reverse FCA claim against the Simparel defendants in a Second Amended Complaint, which the District Court again dismissed.

_____

[2] In his First Amended Complaint, Petras also sued Log Logistics, another company Roth founded; and MontERP Enterprises, f/k/a Ron Cacchione LLC, a Canadian consulting company.

[3] 31 U.S.C. § 3729(a)(1)(G).

[4] *Id.* § 3730(h).

[5] *Id.* § 3729(a)(1)(C).

On appeal, Petras challenges the District Court's dismissal of both Complaints. For the reasons that follow, we will affirm.

## I.

### A. Background

Simparel sells proprietary software to apparel manufacturing companies. Simparel's original investor was L Capital, a venture capital firm licensed by the Small Business Administration, a federal agency. The SBA provided over $90 million to L Capital through the purchase of certain securities, over $4 million of which was invested in Simparel. In return, L Capital received preferred shares of Simparel representing 50.1% of that entity. That amount was later reduced to 37.88% after the firm sold some shares.

The Amended and Restated Certificate of Incorporation ("the Certificate") specified two conditions that would require Simparel to pay preferred shareholders, such as L Capital, accrued dividends. The Certificate provided for such payments if Simparel's Board exercised its discretion to pay the dividends or if Simparel underwent an involuntary or voluntary liquidation, dissolution, or windup.

From 2007 to 2012, Petras was Simparel's Chief Financial Officer, David Roth was CTO, and Ron Grilli was its CEO. The SBA was appointed as receiver of L Capital in 2012 after Simparel failed to comply with its SBA funding agreement. Petras contends that this failure resulted in the SBA becoming a preferred shareholder in Simparel, thus triggering the Certificate's provisions and entitling the SBA to accrued dividends as a direct shareholder.

Petras does not allege that the Simparel Board ever declared that dividends would be paid, or that Simparel underwent liquidation, dissolution, or windup. He instead claims that the Simparel defendants engaged in certain fraudulent conduct—to which he objected—in order to avoid paying the SBA these contingent dividends. For example, he contends that the Simparel defendants engaged in tactics such as hiding Simparel's deteriorating financial condition from the SBA, failing to hold board meetings to review quarterly results, and neglecting to send Simparel's financial statements

3

to the SBA, as well as other tactics. According to Petras, the Simparel defendants did this to prevent the SBA from placing Simparel into involuntary liquidation, which would have triggered the accrued dividends payment. Petras also alleged that the Simparel defendants avoided dividend payments by diverting customers and technology from Simparel to Log Logistics, which is a company Roth had formed, and MontERP, a Canadian consulting company formed to provide computer programming services to aid Simparel's software development.

After Petras was terminated from employment with Simparel, he filed this suit under the FCA in District Court.

### B. The District Court's Dismissal Orders

Generally, an FCA action under 31 U.S.C. § 3729(a)(1) targets fraudulent efforts to obtain money from the United States Government.[6] A "reverse" FCA suit under § 3729(a)(1)(G), however, arises from fraudulent efforts to reduce or avoid an obligation to pay the Government.[7] More specifically, § 3729(a)(1)(G) imposes liability on anyone who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay . . . money . . . to the Government."

---

[6] *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001) (stating that a plaintiff must show that: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent"); *United States* ex rel. *Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 247 (3d Cir. 2016) (observing that FCA actions "[t]ypically . . . allege that a person or company submitted a bill to the government for work that was not performed or was performed improperly, resulting in an undeserved payment flowing to that person or company").

[7] *See United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 n.12 (3d Cir. 2007) (explaining that a reverse FCA claim is "centered around an alleged fraudulent effort to reduce a liability owed to the government rather than to get a false or fraudulent claim allowed or paid").

The District Court first dismissed with prejudice all of the claims against the Simparel defendants and former defendants (Log Logistics and MontERP) except for the reverse FCA claim, which the District Court dismissed without prejudice. The court held that Petras had not adequately pled that the Simparel defendants had an obligation to pay money to the Government because the "obligations" Petras identified in his First Amended Complaint were "outside the scope of the FCA's definition of an obligation."[8] The dismissal of those substantive claims resulted in dismissal of Petras's conspiracy claim. The District Court also dismissed the retaliation claim, concluding that Petras could not establish the required causal nexus between the alleged retaliatory conduct and his FCA claim because he had not pled that the defendants knew of his claim or the related conduct.[9]

Petras responded by filing a Second Amended Complaint in which he reasserted a reverse FCA claim against the Simparel defendants and attempted to support it with additional allegations.[10] The attempt was unsuccessful, as the District Court again dismissed the FCA claim against the Simparel defendants. The District Court concluded that the alleged obligation to pay the Government that was the

---

[8] J.A., 0024.

[9] The District Court also declined to find that Roth or Grilli were "de facto employers" of Petras to hold them liable for Petras's retaliation claim. J.A., 0031.

In dismissing the claims against former defendants Log Logistics and MontERP, the District Court first observed that Petras withdrew his reverse FCA claim against the two parties and accordingly dismissed that claim. The District Court determined that with no underlying FCA claim, Petras's conspiracy claim could not stand. It also separately concluded that it lacked personal jurisdiction over MontERP anyway. Moreover, Petras's conspiracy claim, according to the District Court, did not meet Fed. R. Civ. P. 9(b)'s pleading requirements.

[10] In his Second Amended Complaint, Petras did not reassert claims against Log Logistics and MontERP.

basis of the FCA claim was too "speculative" to give rise to an obligation under the FCA.[11]

Petras now appeals the District Court's dismissal of both his First Amended Complaint and his Second Amended Complaint.[12]

## II.

*A. Legal Standards*

Our review of the District Court's dismissal is plenary.[13]  We have previously explained that a private individual, known as a "relator," may bring a civil action in the name of the United States to enforce the FCA.[14]  Nevertheless, a relator's action survives a motion to dismiss

---

[11] J.A., 0049 –50.  The District Court specifically rejected Petras's three central allegations as to how Appellees prevented the dividend payout. The District Court, for example, noted that Petras had not alleged that Simparel was unable to pay the full value of accrued dividends if they ever came due, or that had the shareholders known the information about which he speculated, they would have dissolved Simparel.  It also observed that the shareholders had not sought dissolution even after Petras's allegations came to light by way of this lawsuit.  Finally, the District Court cited the lack of factual allegations to support a conclusion that had the Board meetings occurred, dividends would have been declared.  The District Court therefore concluded that Petras did not state a claim under the FCA.

[12] Petras does not appeal the dismissal of his retaliation claims as against Roth and Grilli, individually, and we therefore do not consider them.  While Petras did not reassert claims against Log Logistics and MontERP in his Second Amended Complaint, he nonetheless now attempts to revive the conspiracy claim against Log Logistics and MontERP that he pled in his First Amended Complaint.

[13] *Customs Fraud Investigations*, F.3d 242 at 248 ("We review a District Court's judgment of dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) de novo." (citing *Bronowicz v. Allegheny Cnty.*, 804 F.3d 338, 344 (3d Cir. 2015)).

[14] *U.S.* ex rel. *Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (citing 31 U.S.C. § 3730(b) & (d)).

under Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the factual allegations "raise a right to relief above the speculative level."[15]  Thus, the complaint must state a "plausible claim for relief."[16]

Beyond this general standard, we have also explained that FCA claims in particular must be pled with particularity under Rule 9(b).[17]  Under Rule 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity,"[18] and a party must plead his claim with enough particularity to place defendants on notice of the "precise misconduct with which they are charged."[19]

With these standards in mind, we will proceed to evaluate the District Court's dismissal of each of Petras's claims.[20]

*B. Petras's Reverse FCA Claim*

Petras's reverse FCA claim alleges that the Simparel defendants knowingly and improperly avoided a contingent obligation to pay the accrued dividends to L Capital after L Capital had been placed into receivership and was being operated by the SBA.  On appeal, Petras argues that the District Court ignored the plain meaning of the FCA's definition of "obligation" and that the court's ruling contravenes Congress's intent to broadly construe that term,

---

[15] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[16] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[17] *Customs Fraud Investigations*, 839 F.3d at 258 (assessing the sufficiency of a reverse FCA claim using Fed. R. Civ. P. 9(b)); *United States* ex rel. *Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n.9 (3d Cir. 2004).

[18] *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (quoting Fed. R. Civ. P. 9(b)).

[19] *Lum v. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir. 2004), *abrogated in part on other grounds by Twombly*, 550 U.S. at 557.

[20] The District Court had jurisdiction over Petras's FCA claims under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.  We have jurisdiction to review the District Court's final order under 28 U.S.C. § 1291.

as evidenced by recent amendments to the FCA.[21] Petras also challenges the District Court's finding that the obligation he alleged was too "speculative."[22] On that specific issue, according to Petras, the standard is not whether it is "possible that the triggering events for payment of accrued dividends may never occur," but rather simply whether it is "plausible" under his Second Amended Complaint's well-pleaded facts that the contingencies "could reasonably occur."[23]

We begin our analysis with the relevant statutory text. For Petras to assert a viable reverse FCA claim, he must show that the Simparel defendants "knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the *Government*."[24] The Simparel defendants reiterate their argument on appeal that Petras's reverse FCA claim fails because the SBA was not the "Government" when it was acting as the receiver for L Capital, a private entity. The District Court did not address this issue. However, since it is an issue of first impression before this court, we will take this opportunity to address it.

We conclude that the SBA, when acting as a receiver under the circumstances here, was not acting as the Government. In the absence of controlling precedent, we find the decisions of our sister circuit courts of appeal helpful. In *United States v. Beszborn*, for example, the Court of Appeals for the Fifth Circuit held that the Resolution Trust Corporation, an entity the Federal Government created to handle failed financial institutions' affairs, was not a Government actor when operating as receiver of a failed bank.[25] As receiver, the RTC sued the former officers and directors of the failed bank and obtained a judgment that included punitive penalties.[26] When the Government later criminally charged the officers and directors for the same conduct, the Fifth Circuit rejected the defendants' double jeopardy defense.[27] The Fifth Circuit concluded that the

---

[21] Appellant's Br., at 28–29.

[22] *Id.* at 29.

[23] *Id.*

[24] 31 U.S.C. § 3729(a)(1)(G) (emphasis added).

[25] 21 F.3d 62, 68 (5th Cir. 1994).

[26] *Id.* at 67.

[27] *Id.* at 67–68.

RTC, as receiver, was not a Government entity because it had merely stood in the failed bank's shoes.[28]

More recently in *United States* ex rel. *Adams v. Aurora Loan Servs., Inc.*, the Court of Appeals for the Ninth Circuit applied a similar principle under the FCA.[29] There, relators brought a traditional FCA suit against lenders and loan servicers, alleging that they had submitted false certifications to the mortgage entities, the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), by selling loans to those companies.[30] The relators argued that the false certifications to Fannie Mae and Freddie Mac constituted "claims" under the FCA because they were requests for payment "'presented to an officer, employee, or agent of the United States.'"[31] The court rejected the relators' argument, concluding that the mere fact of the Federal Housing Finance Agency's conservatorship of Fannie Mae and Freddie Mac did not mean those companies had become "federal instrumentalities."[32] The Ninth Circuit explained that the Federal Housing Finance Agency, as conservator, assumed all of Fannie Mae's and Freddie Mac's rights, titles, powers, and privileges, "plac[ing] [the] FHFA in the shoes of Fannie Mae and Freddie Mac, and giv[ing] the FHFA *their* rights and duties, not the other way around."[33]

The same logic applies here. As a general matter, when a federally chartered—but private—entity is placed into

---

[28] *Id.* at 68. *See also Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 94–95 (D.D.C. 2012) (dismissing the plaintiff's claim under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) against the Federal National Mortgage Association ("Fannie Mae") and emphasizing that it "was not converted into a government entity when it was placed into conservatorship; instead, [the Federal Housing Finance Agency] stepped into the shoes of Fannie Mae").

[29] 813 F.3d 1259, 1260 (9th Cir. 2016).

[30] *Id.*

[31] *Id.* (quoting 31 U.S.C. § 3729(b)(2)(A)(i)).

[32] *Id.* at 1260–61.

[33] *Id.* at 1261–62 (affirming the district court's dismissal of the relators' FCA claim).

receivership, the relevant federal agency, acting as receiver, "takes over the day-to-day operations and assumes the powers of shareholders, board of directors, and management."[34] In other words, the agency usually "steps into the private status of the entity"[35] and does not retain any federal authority.

A governmental entity acting in its capacity as receiver thus does not necessarily qualify as the "Government" for purposes of the FCA. Here, the SBA, as the receiver of L Capital, an indisputably private entity, assumed "all powers, authorities, rights and privileges heretofore possessed by the general partner, managers, officers, directors, investment advisors and other agents of L Capital."[36] The SBA did so "for the purpose of marshalling and liquidating in an orderly manner all of L Capital's assets and satisfying the claims of creditors thereof in the order of priority as determined by [the] Court."[37] The SBA thus temporarily "stepped into" L Capital's private shoes for the sole purpose of winding up the firm. The authority for doing so was purely contractual in nature. Accordingly, the SBA did not qualify as the Government for purposes of the FCA.

We realize, of course, that the Ninth Circuit's decision in *Adams* concerned the FDIC and a traditional FCA claim. However, that is a distinction without a difference. We see no reasoned basis for reaching a different result for the reverse FCA action before us. Indeed, the SBA's own internal operating procedures support the conclusion that the SBA was not acting as a governmental actor for purposes of Petras's reverse FCA claim:

---

[34] *Herron*, 857 F. Supp. at 93; *see also, e.g.*, *United States* ex rel. *Todd v. Fid. Nat'l Fin., Inc.*, No. 1:12-CV-666-REB-CBS, 2014 WL 4636394, at *9 (D. Colo. Sept. 16, 2014).

[35] *Herron*, 857 F. Supp. 2d at 94; *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) ("[T]he FDIC as receiver 'steps into the shoes' of the failed [financial institution]."); *Beszborn*, 21 F.3d at 68 ("The RTC as receiver of an insolvent financial institution stands in the shoes of the bank assuming all debts of the bank.").

[36] J.A. 0210.

[37] J.A. 0209.

10

> After SBA is appointed as Receiver (SBA-Receiver), SBA is a fiduciary, responsible to the court and to <u>all</u> creditors, including SBA-Creditor, and parties in the interest of the proper operation and/or liquidation of the debtor. The Receiver is a *separate* legal entity and, as such, its funds, records, claims, assets, and liabilities *are not* the funds, records, claims, assets, and liabilities of *SBA or the Government*. SBA-Receiver's decisions must be made for the benefit of the entire Receivership estate.[38]

Accordingly, Petras's reverse FCA claim must fail at the outset.[39]

Moreover, even if the SBA could qualify as the Government, Petras's reverse FCA claim would nevertheless fail for the reasons set forth by the District Court.

The FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or

---

[38] SBA, *SBIC Liquidation SOP 10 07 1*, at 52, *available at* https://www.sba.gov/sites/default/files/sops/serv_tools_sops_1007_1_0.pdf (first and third emphases in original and remaining emphases added).

[39] Despite Petras's suggestion, our conclusion does not conflict with dicta we provided in *Hutchins*, 253 F.3d at 176. In *Hutchins*, a paralegal notified the United States Trustee that his law firm employer was submitting fraudulent billing statements to the United States Bankruptcy Court for payment from the U.S. Treasury. As Petras notes, we stated in *Hutchins*—with no additional analysis—that it was "undisputed that the United States Trustee and the United States Bankruptcy Courts are government agents for purposes of the False Claims Act." *Id.* at 182. The U.S. Trustee and U.S. Bankruptcy Courts were not implicated as receivers in that case, and neither party otherwise challenged whether those entities were governmental actors. Thus, this Court's statement in *Hutchins* regarding those entities is of little guidance on the specific issues here.

11

regulation, or from the retention of any overpayment."[40] Petras argues that the Simparel defendants' obligation to pay accrued dividends, while contingent on either the Board's declaration of dividends or the company's liquidation, nonetheless satisfies the FCA's definition of an "obligation." To support his argument that this FCA definition includes contingent obligations, Petras asks us to focus on "an established duty, whether or not fixed."[41] According to Petras, such qualifying language demonstrates that the term, "obligation," includes instances in which a legal duty did not exist at the time of the FCA-prohibited conduct.

The FCA provision does not define "established duty;" nor does it explain the meaning of the phrase, "whether or not fixed." Given the statute's ambiguity, we will address the parties' arguments regarding legislative history.[42]

That legislative history confirms the District Court's conclusion that the contingent nature of the "obligations" at issue here precludes a finding that they are sufficiently definite to be included within the provisions of the FCA. The current definition of "obligation" for reverse FCA claims resulted from the 2009 amendments to the FCA that were part of the Fraud Enforcement and Recovery Act of 2009 ("FERA").[43] The FERA Senate Report states that the new definition of "obligation" was intended to address "confusion among courts that have developed conflicting definitions."[44] The legislative history, as discussed below, reveals that an "established duty" more likely refers to one owed at the time that the alleged improper conduct under the FCA occurred. Contrary to Petras's argument, the term does *not* include a duty that is dependent on a future discretionary act.

As originally proposed by United States Senators Leahy and Grassley, the FCA provision defined obligation as

---

[40] § 3729(b)(3).

[41] *Id.*

[42] *See United States v. Kouevi*, 698 F.3d 126, 133 (3d Cir. 2012) ("Legislative history is only an appropriate aid to statutory interpretation when the disputed statute is ambiguous.").

[43] Pub. L. No. 111–21, 123 Stat. 1617 (2009).

[44] S. Rep. 111-10, at 14 (2009).

"a fixed duty, or a contingent duty arising from an express or implied contractual . . . or similar relationship."[45]  Senator Kyl suggested revising the definitional language, "a fixed duty, or a contingent duty," to instead state: "an established duty, whether or not fixed."[46]  Senator Kyl was concerned that under the original language Senators Leahy and Grassley had proposed, relators would feel emboldened to sue to enforce fines before the Government had "formally established" the duty to pay them.[47]  For example, if a corporation had falsely claimed compliance with a regulation, a relator could then bring a reverse FCA suit based on this conduct and assert that the corporation was improperly avoiding an obligation to pay discretionary fines that the Government might levy for this conduct.  Senator Kyl proposed his revision to prevent relators from bringing such speculative FCA claims, and his proposal for the alternative language was ultimately adopted.

Again, although the factual circumstances here are different, the difference is without a distinction.  The same basic principle animating Senator Kyl's concern applies.  Petras should not be able bring a reverse FCA claim alleging that the Simparel defendants improperly avoided an obligation to pay the Government because the obligation did not exist when the defendants' alleged misconduct occurred.  Even if we assume Petras's allegations that the Simparel defendants withheld financial information from the SBA and diverted resources to other entities are true, the allegations do not make out an FCA claim under the circumstances here.  The two events that would trigger an actual obligation to pay dividends—either the Board's declaration of the dividends or Simparel's liquidation—had not yet materialized, and Petras does not allege that they had or that he even knew when they would have materialized.  Indeed, the obligation technically would never materialize if the Board never exercised its discretion to declare the dividends or if Simparel never liquidated.

---

[45]155 Cong. Rec. S. 4539 (2009) (daily ed. Apr. 22, 2009) (statement of Sen. Kyl).
[46] *Id.*
[47] *Id.*

Moreover, the legislative history of the statute's other relevant language—"whether or not fixed"—suggests a reference to "whether or not the *amount* owed" was fixed at the time of the violation, not "whether an obligation to pay was fixed."[48]  In discussing the meaning of "obligation," the Senate Judiciary Report explained that an "obligation arises across the spectrum of possibilities from the fixed *amount* debt obligation . . . to the instance where there is a relationship between the Government and a person that results in a duty to pay the Government money, whether or not the *amount* owed is yet fixed."[49]  This understanding of the phrase conflicts with Petras's argument that the "whether-or-not-fixed" phrase refers to the contingent obligation in this case—that is, the obligation to pay accrued dividends that arises when the Board declares dividends, or if Simparel is liquidated.

We conclude then that for a reverse FCA claim, the definition of an "obligation" refers to one existing at the time of the improper conduct to pay the Government funds, the amount of which may not be fixed at the time of the improper conduct.[50]  Our rationale accords with other appellate courts' similar conclusions in other contexts.[51]

---

[48] *See United States* ex rel. *Boise v. Cephalon, Inc.*, No. 08-287, 2015 WL 4461793, at *1 n.1 (E.D. Pa. July 21, 2015) (internal quotation marks omitted) (quoting 1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.01[L], 2–83 (2014)).

[49] S. Rep. No. 111-10, at 14 (2009) (emphases added) (citations omitted) (internal quotation marks omitted).

[50] In our recent consideration of whether a failure to pay marking duties on imported products could give rise to a reverse FCA claim, we consulted the history of the 2009 FERA amendments and observed that the amendments' new definition of obligation "favor[ed] a more broadly inclusive definition" of the FCA's reverse-false claim provision. *See Customs Fraud Investigations*, 839 F.3d at 254.  In that case, the plaintiff had alleged that the defendant company, Victaulic, neglected to notify the United States Bureau of Customs and Border Protection (CBP) of its pipe fittings' non-conforming status. This failure to notify resulted in the pipe fittings being released into the stream of commerce in the United States and, consequently, owed marking duties not

being paid. *Id.* at 254–55. The district court concluded that Victaulic's conduct was not grounds for false claims liability because such duties "were too attenuated and contingent to qualify as the types of obligations to pay money to the government covered by the FCA." *Id.* at 248. We rejected the district court's rationale. We explained that because the duty accrued at the time of importation, "without exception,"—which the plaintiff alleges Victaulic knew—all the plaintiff had to prove to hold Victaulic liable under the FCA was that Victaulic knew of its obligation under federal law to properly mark its goods (or otherwise notify the CBP) and that Victaulic failed to do so before its goods cleared customs. *Id.* at 254–55 (observing that the 2009 United States Senate Report "discussed customs duties for mismarking country of origin, and how such duties would be covered by the amended reverse false claims provision" (internal quotation marks and citation omitted)).

Here, by contrast, the District Court's concern about the accrued dividends being too "speculative" to implicate FCA liability is justified. For one, Petras has not alleged either of the two conditions under which the Simparel defendants' obligations would have arisen. Petras never alleges that the Board declared the dividends or had an inclination to do so; nor had Simparel entered into liquidation, and Petras does not allege as much. The District Court did not, as Petras suggests, conflate the terms "contingent" and "speculative." Instead, the District Court properly concluded that regardless of the proper definition of "contingent," the scenarios Petras advanced were so speculative that they could not be considered a contingent obligation. J.A., 0047. We agree with that conclusion.
[51] In *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, for example, a relator sued his former employer under a reverse FCA action, alleging that his employer had failed to report chemical leaks to the EPA, as the Toxic Substances Control Act requires. 843 F.3d 1033, 1034 (5th Cir. 2016). The plaintiff claimed that the employer's failure to do so allowed it to avoid government penalties, which, under the TSCA, the EPA has the discretion to assess. *Id.* at 1040. The plaintiff argued that after the 2009 FCA amendments, the definition of "obligation" covered "contingent" penalties. But the Fifth Circuit clarified that the

15

In sum, under the FCA provision's plain language, the Simparel defendants could not have "knowingly and improperly avoid[ed] or decrease[d] an obligation"[52] to pay the accrued dividends at the time of their alleged misconduct because the obligation did not yet exist. Accordingly, even if the SBA qualified as the Government for purposes of Petras's FCA action, we would still affirm the District Court's dismissal of Petras's reverse FCA claim.

### C. Petras's Conspiracy and Retaliation Claims

Petras's remaining claims are (1) that Log Logistics, MontERP, and the Simparel defendants all conspired to violate the reverse FCA provision; and (2) that the Simparel defendants unlawfully retaliated against him by terminating him after they became aware that he might file a FCA suit. Our explanation of why the District Court was correct in dismissing the FCA claim applies with equal force to the dismissal of Petras's conspiracy claim.[53]

The District Court dismissed Petras's FCA retaliation claim because Petras had failed to sufficiently plead that the Simparel defendants knew that he would file an FCA claim before they terminated him. In order to properly plead a FCA retaliation cause of action, Petras needed to show that "(1) he engaged in 'protected conduct,' (i.e., acts done in furtherance of an action under [31 U.S.C.] § 3730) and (2) that he was discriminated against because of his 'protected conduct.'"[54] Petras also was required to show that the Simparel defendants were "on notice of the 'distinct possibility' of False Claims Act litigation and retaliated against him because of his 'protected conduct.'"[55] Petras claims that the District Court erroneously concluded that he had not made clear that he had

---

"new definition resolved uncertainty regarding whether the *amount* of an obligation needs to be fixed" and "did not upset the widely accepted holding that contingent penalties are not obligations." *Id.* at 1036.

[52] 31 U.S.C. § 3729(a)(1)(G).

[53] *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014) ("[T]here can be no liability for conspiracy where there is no underlying violation of the FCA.").

[54] *Hutchins*, 253 F.3d at 186.

[55] *Id.* at 191.

alerted the Simparel defendants of his intention to file an FCA action.

Even if Petras had sufficiently alleged such notice—an issue we do not address here—"the whistleblower protections apply only to actions taken in furtherance of a *viable* False Claims Act case," though it need not be a "winning FCA case."[56] Here, for the reasons already explained, Petras's reverse FCA action is not viable. Therefore, Petras's retaliation claim fails as well.

### III.

For the reasons set forth above, we will affirm the District Court's dismissal of Petras's complaint.

---

[56] *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 107–08 (3d Cir. 2002) (explaining that "courts . . . require that there at least be a distinct possibility that a viable FCA action could be filed . . . . If there is no way that [a plaintiff's] conduct of informing [his employer] about the allegedly fraudulent application could reasonably lead to a viable FCA action, then the whistleblower provision provides him no protection."); *see also Hutchins*, 253 F.3d at 188.