**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2899
_____

UNITED STATES OF AMERICA ex rel. DON ASCOLESE

v.

SHOEMAKER CONSTRUCTION CO.;
MCDONOUGH BOLYARD PECK INC.;
SHOEMAKER SYNTERRA JV


Don Ascolese,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:18-cv-01864)
District Judge: Honorable Mitchell S. Goldberg
_____

Argued on September 20, 2022

Before: AMBRO, RESTREPO, and FUENTES
*Circuit Judges*

(Filed: November 30, 2022)

David F. McComb   [Argued]
Zachary A. Silverstein
Zarwin Baum DeVito Kaplan Schaer Toddy P.C.
2005 Market Street
One Commerce Square, 16th Floor
Suite 1300
Philadelphia, PA 19103
        *Counsel for Appellant*

Eileen M. Ficaro      [Argued]
Kaufman Dolowich & Voluck, LLP
1600 John F. Kennedy Boulevard
Four Penn Center
Suite 1030
Philadelphia, PA 19103
        *Counsel for Appellee*

_____

**OPINION**

_____

RESTREPO, *Circuit Judge*.

Appellant Don Ascolese, a compliance officer, challenges the District Court's dismissal of his False Claims Act ("FCA") retaliation claim against his former employer, Appellee McDonough Bolyard Peck ("MBP"), in connection with a *qui tam* action involving a federally funded public housing construction project for the Philadelphia Housing Authority ("PHA"). In 2009–2010, Congress amended the FCA to expand the scope of protected conduct shielded from retaliation

and the type of notice an employer must have of the protected conduct. Here, the District Court denied Ascolese leave to file a Second Amended Complaint, applying both the old and new standards for retaliation under the FCA. This Court has not yet had the opportunity to address the statutory changes to the FCA retaliation standard. We take the occasion to do so now and adopt the new post-amendment standard. We will vacate and remand to the District Court for further proceedings.

## I. BACKGROUND

This is a whistleblower case brought under the FCA. The relevant background has three parts: (1) the statutory background, (2) the underlying alleged facts, and (3) the ensuing procedural history. We recount each part below.

### A. Statutory Background

The FCA prohibits any person from, *inter alia*, knowingly presenting a "false or fraudulent claim for payment or approval" to the United States government. 31 U.S.C. § 3729(a)(1)(A). It extends to all false claims resulting in the receipt of funds from the United States Treasury. *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 185 (3d Cir. 2001). The government may bring a direct suit to recover damages resulting from fraudulent claims or, "[a]lternatively, a private plaintiff [known as a relator] may bring a *qui tam* action on behalf of the government to recover losses incurred because of fraudulent claims," in exchange for an award of up to thirty percent of the funds the government recovers. *Id.* at 181–82 (citing 31 U.S.C. §§ 3730(b)(1), (d)).

Employees seeking to report from within an organization might be reluctant to use these *qui tam* provisions for fear of employer backlash, thus the act also shields whistleblowers from retaliation "because of" conduct protected by the FCA. 31 U.S.C. § 3730(h)(1). Prior to 2009, protected activity included only "lawful acts done by the employee . . . in furtherance of an action under this section [*i.e.*, a *qui tam* suit]." 31 U.S.C. § 3730(h) (2008). This was known as the "distinct possibility" standard since it required plaintiffs to show that their employer had notice of the distinct possibility that the plaintiff was contemplating the filing of an FCA lawsuit. *Hutchins*, 253 F.3d at 179 (holding that "a retaliatory discharge cause of action under 31 U.S.C. § 3730(h) requires proof that the employee engaged in 'protected conduct' and that the employer was on notice of the 'distinct possibility' of False Claims Act litigation and retaliated against the employee").

In 2009, however, Congress expanded the universe of protected conduct to whistleblowers who lawfully try to stop one or more violations of the Act, without regard to whether their conduct advances a *qui tam* suit under the Act:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others *in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter*.

4

31 U.S.C. § 3730 (emphasis added). Congress amended these whistleblower protections once again in 2010, now expressly protecting "lawful" acts "in furtherance of" *either* "an action" under the FCA *or* "other efforts to stop 1 or more violations of" the Act. 31 U.S.C. § 3730(h)(1); *see, e.g.*, *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 765 (10th Cir. 2019) (adopting these two amendments to the Act).

The legislative history confirms the change was made to "protect[] not only steps taken in furtherance of a potential or actual *qui tam* action, but also steps taken to remedy the misconduct . . . whether or not such steps are clearly in furtherance of a potential or actual qui tam action." 155 Cong. Rec. E1295-03, E1300 (June 3, 2009) (statement of Rep. Berman). In other words, to plead retaliation under the FCA, it is no longer solely required that an employer be on notice that a plaintiff is contemplating FCA litigation. *See, e.g.*, *Singletary v. Howard Univ.*, 939 F.3d 287, 296 (D.C. Cir. 2019) (explaining that the newly added language "is not tied to the prospect of a False Claims Act proceeding" and instead "focuses on the whistleblower's efforts to stop violations of the statute before they happen") (internal quotations omitted).[1] The events giving rise to this litigation took place against this statutory backdrop.

---

[1] "To put it simply, the focus of the second prong is preventative—stopping 'violations'—while the first prong is reactive to an (alleged) actual violation of the statute." *Singletary*, 939 F.3d at 296 (internal citations omitted)).

**B. Factual Background**

On July 1, 2014, the United States Department of Housing and Urban Development ("HUD") awarded a $30 million grant to the PHA for the construction of public housing in North Philadelphia (the "Project"). The PHA designated Shoemaker Construction Co. and Shoemaker Synterra JV (together, "Shoemaker"),[2] a joint venture, as construction managers for the Project. In the Spring of 2017, Shoemaker subcontracted Appellee MBP to handle quality control and ensure that the Project met all required construction standards.

Ascolese worked for MBP as the Quality Assurance/Quality Control ("QA/QC") Manager for the Project. In this role, he was tasked with detecting and reporting "deficiencies" such as issues with the Project's "design plans, specifications and building codes." App. 80. He was required to maintain an electronic "Project Deficiency List," noting each time the contractors failed to follow design plans and specifications or building codes. In that capacity, Ascolese "outlined dozens of Project deficiencies" during his employment.

Ascolese alleges that he sent repeated emails to MBP and Shoemaker expressing concerns regarding compliance with the relevant contractual standards. For example, Ascolese alleges that "the concrete used in the foundational walls had not been allowed to fully cure before being backfilled. Nor was steel horizontal rebar used in the foundation walls, even though the building and design specifications required it as a fundamental safety measure." App. 186. Ascolese "advised

---

[2] Ascolese settled his claims against Shoemaker and dismissed it from the action; thus, Shoemaker is not a party to this appeal.

MBP and [Shoemaker management] that because of the dozens of project deficiencies on the [Deficiency List], it would be wrong and fraudulent under those circumstances for [Shoemaker] and MBP to be paid government funds and that certifications of their contract compliance to obtain payments would necessarily be false and fraudulent." App. 199–200.

When neither Shoemaker nor MBP acted in response to his internal complaints, Ascolese broke his chain of command and expressly informed PHA's engineers, via email on December 5, 2017, that Shoemaker's concrete work was deficient. Ascolese informed PHA engineers via email that "we may have a problem with the foundation walls at [several of the Project buildings]" and that the concrete work did not meet the necessary requirements. App. 188.

After Ascolese sent these external emails, Shoemaker told him not to go into the field—where he normally reviewed the Project's construction work and compliance issues—and instead should "just put [his] feet up on the desk and take it easy." App. 188. Ascolese was further instructed to "keep his concerns to himself and not relay them to PHA." App. 190. But Ascolese allegedly chose to not obey and "continued to question the safety of the project and note deficiencies," including uploading over 1,600 photographs reflecting these deficiencies in the Project Submittal Exchange. App. 188–89. Shortly thereafter, on January 18, 2018, MBP informed Ascolese that Shoemaker wanted him "off the job" and fired him. App. 199. Ascolese alleges that his termination constituted unlawful retaliation for whistleblowing activities protected by the FCA.

### C. Procedural History

Following his termination from MBP, Ascolese filed a *qui tam* action on behalf of the government under the FCA.[3] Ascolese alleged that MBP and Shoemaker defrauded the government by falsely certifying compliance with safety requirements to get paid by the PHA. He further alleged that his employer, MBP, illegally retaliated against him for trying to stop MBP and Shoemaker's fraud, which is protected activity under § 3730(h) of the False Claims Act. After the government declined to intervene and Ascolese amended his complaint to, *inter alia*, withdraw certain claims generally applicable only to the government, MBP moved to dismiss the suit for failure to state a claim.

On April 19, 2021, the District Court granted MBP's Motion to Dismiss on all counts without prejudice. At the Court's invitation, Ascolese moved for leave to file a Second Amended Complaint. His proposed amendment contained several new allegations regarding MBP's alleged notice of FCA-protected whistleblower conduct, including that Ascolese advised MBP that (1) "because of the dozens of project deficiencies . . . , it would be wrongful and fraudulent . . . for [Shoemaker and MBP] to be paid government funds;" (2) "certifications of [Shoemaker's] contract compliance to obtain payments would necessarily be false and fraudulent;" and (3) he was concerned that Shoemaker was intentionally hiding deficiencies from the PHA. App. 199. Ascolese also clarified that when he made reports directly to the PHA, he was acting outside of his usual "reporting chain of command." App. 199.

---

[3] Because he filed a *qui tam* action, the record refers to Ascolese as both a "plaintiff" and a "relator."

On June 7, 2021, the District Court denied Ascolese's motion for leave to file a Second Amended Complaint, concluding that amendment would be futile because Ascolese failed to show that MBP was on notice that he would file an FCA action or report fraud to the government, or that he acted to stop one or more of MBP's alleged FCA violations. Ascolese filed a motion for reconsideration, which the District Court denied on June 17, 2021.

Ascolese now appeals from the District Court's order denying leave to file a Second Amended Complaint. His appeal presents two overarching questions. First, did the District Court exercise proper discretion in denying Ascolese's motion for leave to file a Second Amended Complaint? Second, did the Court exercise proper discretion in not granting Ascolese's motion for reconsideration of its order denying leave to file the proposed Second Amended Complaint?

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had federal question jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which provides for review of final decisions of the district courts.

We review a district court's decision granting or denying leave to amend a complaint for abuse of discretion. *See Urrutia v. Harrisburg County Police Dept.*, 91 F.3d 451, 457 (3d Cir. 1996). However, we review this decision *de novo* when the amendment was denied for legal reasons, such as when the proposed amendment would fail to state a claim. *Mullin v. Balicki*, 875 F.3d 140, 150 (3d Cir. 2017). The Court reviews a denial of a motion for reconsideration under an

9

abuse-of-discretion standard. *B.C. v. Att'y Gen. United States*, 12 F.4th 306, 313 (3d Cir. 2021).

### III. DISCUSSION

This Court has not yet had the opportunity to address the effect of the 2009–2010 Congressional amendments on the FCA retaliation standard. This has led to some confusion in the District Courts of the Third Circuit. Here, the District Court understandably misinterpreted Third Circuit precedent as holding that Ascolese is "require[d]" to show that MBP had notice either that he was contemplating FCA litigation or reporting to the government that MBP had committed fraud. App. 35–36 (citing *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 (3d Cir. 2017)). However, this pre-amendment "distinct possibility" standard is no longer the sole basis for liability.

The District Court correctly acknowledged that the new standard is whether Ascolese showed "(1) he engaged in protected conduct (in furtherance of an [FCA] action . . . or other efforts to stop 1 or more violations of the [the FCA]) and (2) that he was discriminated against because of his protected conduct." App. 35. However, the District Court, necessarily affected by its belief that the pre-amendment standard was required by the Third Circuit, ultimately concluded that Ascolese failed to show MBP was on notice that he was attempting to stop MBP from violating the FCA and not merely doing his job as a Quality Control/Quality Assurance Manager for the Project.

10

## A. Retaliation Standard After the FCA Amendments

We take this occasion to formally adopt a reading of the anti-retaliation standard that takes into consideration the 2009–2010 FCA amendments. *See United States v. Adams*, 252 F.3d 276, 286 (3d Cir. 2001) (observing that "[a]lthough a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel, a panel may reevaluate a precedent in light of intervening authority and amendments to statutes or regulations") (citation omitted). In this Court's only post-amendment FCA retaliation case, *Petras*, we referenced the old "distinct possibility" of FCA litigation standard without considering the newly added "other efforts" to stop FCA violations prong. 857 F.3d at 507. Since *Petras* stated that the whistleblower provision with the notice of an FCA claim element applies "only to actions in furtherance of a *viable* FCA case," it implicitly suggested that the "distinct possibility" standard would continue to apply despite the FCA amendments. *Id.* at 507–08 (emphasis in original); *see, e.g.*, *Heckman v. UPMC Wellsboro*, No. 4:20-CV-01680, 2021 WL 2826716, at *14 n.187 (M.D. Pa. July 7, 2021) (acknowledging limited nature of the *Petras* holding). We determine now that this is not the case.

The District Court understandably concluded that in *Petras* "[t]he Third Circuit [] held that the knowledge prong requires the employee to put his employer 'on notice of the distinct possibility of False Claims Act litigation.'" App. 35 (quoting *Petras*, 857 F.3d at 507). However, we conclude that neither our holding in *Petras* nor the plain text of the amended whistleblower provisions supports such a narrow view. *Petras*'s reaffirmance of the "distinct possibility" standard was

11

limited to the FCA litigation prong of § 3730 since the retaliation claim was only asserted under that element of the whistleblower provision. Briefing shows Petras never raised the "other efforts" prong on appeal. Significantly, the *Petras* Court never reached the retaliation issue since it found that the underlying FCA claim was not viable. *Petras*, 857 F.3d at 507 ("Even if Petras had sufficiently alleged [his employer had] notice [of his protected conduct]—an issue we do not address here. . . Petras's reverse FCA action is not viable. Therefore, Petras's retaliation claim fails as well.").

Furthermore, the amendments to the anti-retaliation provision reflect a congressional intent to expand protection to "'efforts to stop' violations of the statute *before* they happen or recur." *Singletary*, 939 F.3d at 296 (emphasis added). When "Congress expands the scope of activity protected by a statute, we cannot restrict ourselves to applying a narrower old standard that the expansion . . . eschew[ed]." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201 (4th Cir. 2018). Ascolese is correct that the District Court's continued reliance on the old standard vitiates the newly added category of protected activity—"other efforts to stop 1 or more violations of this subchapter"—and renders Congress's amendment null. Appellant Br. 10. Accordingly, we recognize that the 2009–2010 FCA amendments expanded the anti-retaliation standard to protect "lawful" acts "in furtherance of" *either* "an action" under the FCA *or* "*other efforts to stop 1 or more violations of*" the Act. 31 U.S.C. § 3730(h)(1).

## B. Applying the New Standard, Ascolese Sufficiently Pled Retaliation

As relevant here, the right question is whether Ascolese pled facts that plausibly showed MBP was on notice he tried to stop MBP's alleged FCA violations. On appeal, Ascolese "submits that the FCA protects him because he went well beyond the scope of his job responsibility as a QA/QC manager to stop fraudulent conduct at the Project." Appellant Br. 3.

As a compliance employee, Ascolese must do more than his job responsibilities to trigger FCA protection, like "acting outside [his] normal job responsibilities [or] notifying a party outside the usual chain of command." *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1239 (D.C. Cir. 2012); *Hutchins*, 253 F.3d at 194 (holding an employee generally tasked with investigating regulatory deficiencies "must make it clear that his investigatory and reporting activities extend beyond [his] assigned task in order to allege retaliatory discharge under § 3730(h)"); *Reed*, 923 F.3d at 767 (holding that to adequately pled notice, a compliance officer must show they were attempting to stop their employer from violating the FCA, and not just merely doing their job). This is a fact intensive inquiry.

When applying this prong, consistent with the 2009–2010 amendments and Ascolese's pleadings, the District Court should focus on whether Ascolese acted outside of his chain of command or his job duties. Here, the District Court relied on the Tenth Circuit's decision in *Reed*, which involved a senior quality control analyst who brought an FCA action and retaliation claim against her former employer. 923 F.3d at 729. It concluded that, like the relator in *Reed*, Ascolese "has failed to plead specific facts . . . that make clear that MBP was on notice

13

that he was attempting to stop MBP from violating the FCA and not merely doing his job as the Quality Control/Quality Assurance Manager for the Project." App. 37.

Although *Reed* is instructive, it is distinct from this case. The relator in *Reed* did not plead facts regarding her specific job description nor define the scope of her duties such that the court could discern the contours of her chain of command or ordinary reporting structure related to fraud matters. *Reed*, 923 F.3d at 770. Without that information, the court could not say or reasonably infer that the relator broke her chain of command or ordinary communication protocol by speaking with individuals inside the company. *Id.* Accordingly, the *Reed* Court concluded that the relator did not sufficiently plead that she violated her employer's established communication protocol, broke her chain of command, or otherwise acted outside of the scope of her job duties. *Id.* at 771–72.

> i.  *Ascolese sufficiently pled he engaged in protected conduct*

Here, Ascolese sufficiently pled that he engaged in protected conduct when he went outside of his chain of command to report his concerns of fraudulent work to the PHA. He first outlined his usual job responsibilities, including "inspecting and verifying construction activities, noting . . . deficiencies, and various document and records keeping and reporting functions." App. 182. He was "required . . . to maintain a Project Deficiency List" online through "a platform called the Project Submittal Exchange." App. 185, 193.

Ascolese also established the contours of his chain of command—he raised Project issues and safety concerns with

14

his superiors at MBP, and reported MBP's alleged fraudulent conduct to PHA, "HUD's fiscal intermediary and a party outside of [his] reporting chain of command." App. 199. Under the contract with PHA, Shoemaker was supposed to inspect the work of its subcontractors, like MBP. Ascolese listed various MBP and Shoemaker supervisors that he reported to by name. Ascolese also pled that, in an effort to stop FCA violations, he "advised MBP and [Shoemaker] that because of the dozens of project deficiencies on the [deficiency list], it would be wrongful and fraudulent under those circumstances for [Shoemaker] and MBP to be paid government funds and that certifications of their contract compliance to obtain payments would necessarily be false and fraudulent." App. 199–200.

In addition to these internal reports of fraud, Ascolese went outside of his chain of command and continued to document fraudulent project deficiencies despite being told not to do so. After he emailed PHA engineers and told them that there were problems with the foundational walls and the concrete, Shoemaker instructed him to stay out of the field, where he normally reviewed the Project's construction work and compliance issues, and instead should "just put [his] feet up on the desk and take it easy." App. 188. But Ascolese alleges to have disobeyed this instruction and "continued to question the safety of the project and note deficiencies," including uploading over 1,600 photographs reflecting these deficiencies in the Project Submittal Exchange. App. 188–89. He "repeatedly pressed the [P]roject to correct the deficiencies and reiterated that the deficiencies were a violation of the contract standards, fraudulent and creating potentially dangerous conditions" but "he was told to keep his concerns to himself and *not relay them to PHA*." App. 190 (emphasis added); *see, e.g.*, *Schweizer*, 677 F.3d at 1239 (holding relator made prima facie claim of

15

retaliation after pleading she "repeatedly disobeyed the orders of . . . her supervisor, to stop investigating" the alleged FCA fraud). Taking these facts as true and in the light most favorable to plaintiff, Ascolese sufficiently pled that he engaged in protected conduct.

> ii. *Ascolese sufficiently pled MBP was on notice of his protected conduct and retaliated against him because of it*

Ascolese sufficiently alleged that MBP was on notice of his efforts to stop MBP and Shoemaker's alleged FCA violations and retaliated against him because of it. He alleged that "MBP was fully aware of [his] protected activity" because he "complained to MBP and [Shoemaker] management, as well as PHA management on numerous occasions in person and in writing about [Shoemaker's] and MBP's fraudulent conduct." App. 200. Specifically, Ascolese directly advised MBP that receiving government funds for the Project was fraudulent under the circumstances since there were dozens of project deficiencies on his Deficiency List and, consequently, "certifications of their contract compliance to obtain payments would necessarily be false and fraudulent." App. 199–200.

MBP was aware that Ascolese made external reports to the PHA, which was "outside of [his] reporting chain of command." App. 199. After Ascolese circulated an email to several individuals, including PHA engineers, regarding project deficiencies that were allegedly fraudulent, Shoemaker took him out of the field and told him to "just put [his] feet up on the desk and take it easy." App. 188. Ascolese's employer then told him "to keep his concerns to himself and *not relay them to PHA*." App. 190 (emphasis added). Ascolese

16

disobeyed these instructions and continued to make reports on the safety of the Project. A month and a half later, MBP fired him at Shoemaker's request. We conclude that these facts give rise to a plausible inference that MBP was on notice of Ascolese's efforts to stop FCA violations in the Project and retaliated by firing him.

We need not reach a decision on the motion for reconsideration as it is moot.

## IV. CONCLUSION

For the foregoing reasons, we will vacate and remand to the District Court for further proceedings consistent with this opinion.

17